**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TELEVISION AND RADIO BROAD-CASTING STUDIO EMPLOYEES, LOCAL 804, Respondent.**

No. 14015.

United States Court of Appeals Third Circuit.

Argued Dec. 6, 1962.

Decided April 4, 1963.

Melvin J. Welles, NLRB, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Seymour Strongin, Attorneys, National Labor Relations Board, on the brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa. (Wilderman, Markowitz & Kirschner, Philadelphia, Pa., on the brief), for respondent.

Marcus Manoff, Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., amicus curiae, for petitioner.

Before BIGGS, Chief Judge, STALEY, Circuit Judge, and LEAHY, District Judge.

STALEY, Circuit Judge.

The National Labor Relations Board has found that respondent violated § 8(b) (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(b) (5),[1] by charging certain of its members excessive and discriminatory initiation fees. The case is here on the Board's petition for enforcement of its order entered pursuant to that determination.

Respondent is the collective bargaining representative of the employees who work for the Radio and Television Division of Triangle Publications, Inc. ("company") in the operation of a radio and television station in Philadelphia. These employees include, among others, technicians, equipment operators, and studio and stage managers in a non-supervisory capacity. The collective bargaining agreement between the parties for a number of years prior to the alleged unfair labor practice contained a union security provision. During this period it was the company's practice to hire both part-time and temporary employees[2] in the unit covered by the contract. In accordance with the union-shop clause they were advised that they would have to join the union.

The respondent objected to the use of part-time employees because it considered this practice a threat to the

---

1. "§ 158. Unfair labor practices
   \* \* \* \* \*
   "(b) It shall be an unfair labor practice for a labor organization or its agents—
   \* \* \* \* \*
   "(5) to require of employees covered by an agreement authorized under subsection (a) (3) of this section the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected \* \* \*."

2. Stewart Hooker, personnel and labor relations director for the company, distinguished between the two:

"Q. (By Mr. Kaye) Since the question of part time help has just been raised, could you distinguish clearly for the purposes of the record the difference between part time help and temporary help.
   \* \* \* \* \*
"A. The part time help is what the term denotes; people who work less than a full week and at times less than a full day, perhaps as needed and perhaps irregularly from week to week or even day to day would be part time help.

"Temporary help on the other hand, as we mentioned yesterday, might work regularly day in and day out and maybe week and week out [sic] when used as vacation replacements or that sort of thing, or during a football season or baseball season."

job security of regular, full-time employees. In 1957 it increased its initiation fee from $50 to $500 for all new members except those employed in newly organized units. When the company protested, the union relented to the extent of permitting a $50 down payment with $25 monthly payments for each month worked until the entire fee was paid. However, in November 1960, respondent changed the method of payment, requiring a $300 initial payment to be followed by two consecutive monthly payments of $100. The company then filed the unfair labor practice charge which resulted in the order now before us.

This is the first case in which a court has been called upon to construe this particular subsection of the statute, and respondent argues that its legislative history shows that it was never intended to apply to the facts before us. Reduced to its essence, the argument is that § 8 (b) (5) was intended to proscribe the maintenance of a closed shop by means of excessive or discriminatory initiation fees, and that this was not the purpose of respondent, which desired the hiring of more full-time employees by the company. Conceding that one of the purposes of the statute was to inhibit closed shop conditions, we think the argument is devoid of merit. The union's desire for more full-time employees is beside the point for, as found by the Board, the increase in the fee "was designed for the purpose of restraining the Employer in the hiring of part-time employees who were not union members, or to end the practice, thereby restricting employment to full-time union members." 135 N.L. R.B. 632 (1962). This conduct falls squarely within that prohibited by the statute.

There is substantial evidence to support the Board's conclusion that the fee was excessive and discriminatory under all the circumstances. In accordance with the express mandate of the statute, the Board considered, among other relevant factors, the initiation fees of other unions in the industry, and the wages currently paid to the employees affected. The evidence fully supports its finding that no other union in the Philadelphia area representing technicians and crew men charged comparable fees. One union which charged a fee of $1,000 had units in New York as well as Philadelphia and covered newsreel cameramen as well as independent newsreel production. According to General Counsel's Exhibit No. 5, the fees charged by other comparable Philadelphia unions ranged from $10 to $200. In considering the wages currently paid to the employees affected, the Board noted that skilled technicians may eventually earn $200 per week, but deemed the starting salary of from $90 to $95 per week of greater significance. Since we are dealing with initiation fees which by definition are amounts paid by new union members, this analysis is obviously appropriate. These are the employees "affected" by the fee.[3] Respondent's contention that the average weekly earnings of the company's employees exceed $200 per week is not significant, for these are the earnings of regular full-time personnel.

Among the other circumstances considered by the Board were the amount of the increase and the context in which it was effected. The fact that the fee was raised ten fold is obviously important. When this is coupled with the union's vigorous objection to the practice of hiring part-time employees, the Board's inference that the purpose of the fee was to end this practice, thereby restricting employment to full-time union members, was certainly permissible, if, indeed, not ineluctable.

■ The trial examiner concluded that the charge was improperly filed because

---

3. Respondent also urges that its initiation fee compares quite favorably with typical employment agency fees. To this it need only be said that it ill behooves a labor union with the fiduciary responsibilities of a collective bargaining representative to equate its initiation fees with the fees an employment agency charges for its job placement services.

made by the company under a section designed for the exclusive benefit of employees. The union does not seriously press that argument in this court. In any event it is without merit. As pointed out by the Board, its rules permit a charge to be made by "any person." Additionally, a similar argument was rejected in National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 17–18, 63 S.Ct. 394, 87 L.Ed. 579 (1943), because of the very nature of a charge filed with the Board, i. e., it is not proof but merely sets in motion the machinery of an inquiry.

Respondent urges that the union security clause of the collective bargaining agreement is invalid under § 8(a)(3) of the statute, 29 U.S.C.A. § 158,[4] because it fails to provide a full thirty-day period after the execution of the agreement for old non-member employees to become union members, and also requires new employees to become members *within* thirty days after employment. From this it is argued that there could be no violation of § 8(b)(5) which by its terms is restricted to "employees covered by an agreement authorized under subsection (a)(3) * * *."

The union security clause of the most recent contract provides:

"The party of the first part agrees to maintain a Union Shop, requiring that all present employees (with the exceptions noted in Paragraph 1, Article 1) shall become members of the Union and all future employees must become members of the Union within a period of thirty (30) days after employment, and that all employees will continue their membership in the Union during the term of this agreement. If any employee (with the exceptions noted in this Article) does not remain a member in good standing with the Union, as provided in the Labor-Management Relations Act, the party of the first part agrees that it will require the employee to come into good standing with the Union or to be forthwith dismissed from employment."

The Board found the clause valid and hence did not pass on the issue whether an unlawful security clause would preclude a violation of § 8(b)(5). We agree.

With respect to non-member employees at the time the contract was executed, the pertinent phrase is "shall become members of the Union." It is not suggested that any of these were required to join within a shorter period than that prescribed in the statute. Moreover, the contractual relationship had existed since 1948 until the termination of the last contract in 1961. Thus any technical deficiency, if such there is, so far as old employees are concerned, would have existed only during the thirty-day period following the execution of the 1948 contract.

Respondent places great reliance on Chun King Sales, Inc., 126 N.L.R.B. 851 (1960), to support its contention that requiring new employees to become union members *within* thirty days of employment violates § 8(a)(3). Suffice it to say that ten days before its decision in the instant case, the Board overruled its decision in *Chun King Sales*, holding that the phrase "within thirty days" is equivalent to the statutory language "on or after the thirtieth day." New York State Electric and Gas Corp., 135 N.L.R.B. 357 (1962). This analysis appears sound, particularly where, as here, there

---

4. The relevant portion of the section provides:

"§ 158. Unfair labor practices

"(a) It shall be an unfair labor practice for an employer—

    *    *    *    *    *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later * * *."

is no indication that new employees were not given thirty days.

■ The mere fact that the contract expired before the complaint issued does not render the case moot. It is well established that the discontinuance of an unfair labor practice does not render a charge relating to that practice moot. National Labor Relations Board v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 833, 94 L.Ed. 1067 (1950), and cases cited therein. The record reveals that the parties were operating under the terms of their former contract, except for the union security provision, at the time of the hearing, and it is quite likely that any new agreement will contain a union shop clause.

■ The Board's order, in pertinent part, requires respondent to "pay to all employees of the Employer working in classifications covered by any collective bargaining agreement requiring membership in Respondent as a condition of employment all sums in excess of $50 paid Respondent toward the $500 initiation fee on or since June 19, 1960." Respondent, citing Local 60, United Brotherhood of Carpenters v. N. L. R. B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); National Labor Relations Board v. United States Steel Corp., 278 F.2d 896 (C.A.3, 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961); and National Labor Relations Board v. American Dredging Co., 276 F.2d 286 (C.A.3, 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961), contends that the order is beyond the power of the Board in the absence of proof that each of the employees was coerced into making the payments. The cited cases are inapposite. Each of them involved an attempt by the Board to apply its Brown-Olds reimbursement remedy on behalf of members of a union which was a party to a preferential hiring arrangement. However, the gist of the unfair labor practice was the restraint or coercion of employees in the exercise of statutory rights. Thus, in the absence of proof of such coercion the Supreme Court, as well as this court, held that reimbursement to union members who benefited by the very preferential arrangement found to be unlawful was not a remedial measure which would effectuate the purposes of the statute. In the instant case, the unfair labor practice was not the restraint or coercion of employees, but the specific statutory violation of exacting an excessive and discriminatory initiation fee. Hence, it is manifest that there is a rational nexus between this unfair labor practice and the Board's order of reimbursement.

■ Respondent objects that the order is based on a fee of $50. It is said that the presumption inherent in this is that any fee in excess of that amount would be excessive. We disagree. The Board made no attempt to find what fee would not be excessive or discriminatory. The evidence shows that other unions charged fees in excess of $50. However, it was the respondent which abruptly increased its fee from this amount to that found to be excessive and discriminatory. In these circumstances we cannot say that the Board either exceeded its jurisdiction or abused its discretion in using $50 as the basis for its order.

The order of the Board will be enforced, and a form of decree may be submitted.